IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| CHANDRA EVANS, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 2:09-cv-02491 |
| WALGREEN CO. | ) |
| Defendant. | ) |

**DEFENDANT'S APPEAL OF THE MAGISTRATE JUDGE'S DENIAL OF DEFENDANT'S MOTION TO STRIKE SPECIFIC STATEMENTS ASSERTED IN PLAINTIFF'S AFFIDAVITS RESPECTIVELY FILED ON OCTOBER 15, 2010 AND NOVEMBER 14, 2010**

Defendant/Counter Plaintiff Walgreen Co. ("Walgreens"), by and through counsel of record, pursuant to the Federal Rules of Civil Procedure, hereby appeals the order entered by the Magistrate Judge Denying Walgreens Company's Motion to Strike (D.E. 120). In support of this appeal, Walgreens will show this Court as follows[1]:

**INTRODUCTION AND STANDARD OF REVIEW**

Walgreens appeals a decision of the Magistrate Judge, denying its motion to strike specific assertions included in the two affidavits filed by Plaintiff (D.E. 62-1, 63-1) filed in opposition to the motions for summary judgment filed by Walgreens. When such an order is challenged, "the district court should defer to that order unless it is 'found to be clearly erroneous or contrary to law.'" *Tri-Star Airlines, Inc. v. Willis Careen Corp. of Los Angeles*, 75 F. Supp. 2d 835, 839

---

[1] The exhibits relevant to this memorandum were presented with Defendant/Counter Plaintiff's original motion and memorandum of law.  (D.E. 66).

{01554979.DOC}

(W.D. Tenn. 1999) (quoting 28 U.S.C. § 636(b)(1)(A)). "The 'clearly erroneous' standard applies only to factual findings made by the Magistrate Judge, while [his or her] legal conclusions will be reviewed under the more lenient 'contrary to law' standard." *EEOC v. Burlington Northern & Santa Fe Ry. Co.*, 621 F. Supp. 2d 603, 605 (W.D. Tenn. 2009) (quoting *Gandee v. Glaser*, 785 F. Supp. 684, 686 (S.D. Ohio 1992)). *With respect to a magistrate judge's legal conclusions under the "contrary to law" standard*, "the Court may overturn 'any conclusions of law which contradict or ignore applicable precepts of law, as found in the Constitution, statutes, or case precedent.'" *Doe v. Aramark Educ. Res., Inc.*, 206 F.R.D. 459, 461 (M.D. Tenn. 2002) (quoting *Gandee*, 785 F. Supp. at 686) (emphasis added). The appeal at issue asks this Court to review the legal conclusions of the Magistrate Judge and to find that the legal conclusions set forth in the order (D.E. 120) are contrary to the law.

## **CONTROLLING LAW**

A party cannot avoid summary judgment by submitting an affidavit that contradicts earlier testimony. *See, E.G., Lanier v. Bryant* 332 Fed.3d. 99, 1004 (6th Cir. 2003); *See also Penny v. United Parcel Service*, 28 Fed.3d. 408, 415 (6th Cir. 1997)("a party cannot create a genuine issue in material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony.") When determining whether to strike a post-deposition affidavit, the District Court "must first determine whether the affidavit directly contradicts the non moving parties' prior sworn testimony." *Aerel, S.R.L., v. T.C.C. Air Foils, L.C.*, 448 F. 3d. 899, 908 (6th Cir. 2006). If the District Court finds that the affidavit directly contradicts the parties' prior sworn testimony, the Court must strike the affidavit, unless the party "provides persuasive justification for the contradiction." *Id.*

As noted by the Magistrate Judge, if there is no direct contradiction, "then the district court should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Id.* at 908.  To make this determination, the court should consider such things as "whether the affiant was cross examined during his earlier testimony, whether the affiant had pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence and whether the earlier testimony reflects confusion that the affiant attempts to explain." *Id.*

The Sixth Circuit Court of Appeals held that "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Reid v. Sears Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986).  Consistent with this principal, the case law does not prevent "a party who was **not** directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit.  Such an affidavit fills a gap left open by the moving party and thus provides the district court with more information, rather than less, at the crucial summary judgment stage.  Because the deponent is under no obligation to volunteer information not fairly sought by the questioner, [the rule of exclusion should not apply] to such a situation." *Anderson v. Asplundh Tree Expert Co., Inc.*, No. 3:06-CV-0784, 2007 WL 2746890 (M.D. Tenn. Sept. 18, 2007); *Wilson v. Budco*, No. 09-cv-13385, 2011 WL 43423 at *10 (E.D. Mich. Jan. 6, 2011).  The Sixth Circuit in *Briggs v. Potter*, 463 F.3d 507, 513 (6th Cir. 2006) held that when a plaintiff is questioned generally about a conversation but is not asked specifically what was said to him, then the plaintiff is "under no obligation to volunteer" the information and "should not be prevented from providing detail in a later affidavit."

On the other hand, when the plaintiff is "thoroughly question in [her] deposition about [a specific topic] and was given ample opportunity to set forth the [facts]", then "supplementation of [her testimony by] affidavit cannot be said to fill a gap which was left open in the deposition. *Anderson*, 2007 WL 2746890 at *11 (M.D. Tenn. Sept. 18, 2007); *Smith v. Heartland Employment Services, LLC*., No. 2:07-CV-362, 2009 WL 799640 at *9 (S.D. Ohio March 24, 2009)(holding that contradiction existed because plaintiff was specifically questioned about specific statements during her deposition, and she only provided information responsive to the deposition questions by affidavit when she was facing a motion for summary judgment). In *Tiller v. 84 Lumber Co*., the court held that a party cannot "sandbag" opposing parties in depositions, then "spring" an alleged factual basis for a claim in an affidavit after discovery has closed.  886 F.2d 1316 at *4 (6th Cir. Oct. 10, 1989).  The court in *Tiller* described such conduct and then stated, "[c]learly, this cannot be tolerated."  *Id.* at *5.

## ARGUMENT

### A.  During Her Deposition, Plaintiff Was Repeatedly Questioned About All Statements In House Counsel for Walgreens Made During Their Phone Conversations, and Plaintiff Did Not Make Any Allegations of Coercion Until She Was Forced to Respond to Walgreens' Motion for Summary Judgment.

Despite the fact that Walgreens questioned Plaintiff for more than six hours at her deposition and that she was repeatedly asked questions to elicit testimony about all statements made by Mr. Ghogomu, paragraphs 14 and 18 of Plaintiff's affidavits state as follows:

> During the conversations with me, Ghogomu repeated to me what others were saying about what allegedly happened during the incidents we discussed.  He told me his [sic] is what he wanted me to include in my written statement.  He told me I should meet with Steve Walker and Jacob Tibbe and provide these statements to these men.  I was led by Ghogomu to believe that if I did that everything would be fine, and I would be allowed to continue to work at Walgreens. (Pl's Aff., Doc. #62-1, ¶ 14, Doc. #63-1, ¶14).

{01554979.DOC}

> My statement was coerced by Walgreen's management, including Ghogomu who gave me legal advice as to whether to prepare the statement and what should be included in it. (Pl's Aff., Doc. #62-1, ¶ 18, Doc. #63-1, ¶18).

As a preliminary matter, a number of the allegations that Plaintiff asserted for the first time in paragraphs 14 and 18 are conclusory statements and not facts.  The conclusory statements from paragraph 14 and 18 respectively are as follows:

> I was led by Ghogomu to believe that if I did that everything would be fine, and I would be allowed to continue to work at Walgreens. (Pl's Aff., Doc. #62-1, ¶ 14, Doc. #63-1, ¶14).

> My statement was coerced by Walgreen's management, including Ghogomu who gave me legal advice as to whether to prepare the statement . . . (Pl's Aff., Doc. #62-1, ¶ 18, Doc. #63-1, ¶18).

Conclusory allegations such as these are not facts, and this Court should not consider them as part of its summary judgment analysis. *Lewis v. Phillip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004). This Court should strike the above statements, which are irrelevant to the issue of summary judgment.

For the purposes of paragraphs 14 and 18, this Court should strike the allegation that Mr. Ghogomu told Plaintiff what to write in her written statement on the grounds that the statement attributed to Mr. Ghogomu contradicts Plaintiff's prior sworn testimony or creates a sham issue of fact.  While Walgreens was investigating the work place violence incident involving Plaintiff and other related matters, Plaintiff had several conversations with in house counsel for Walgreens, Puamuh Ghogomu ("Mr. Ghogomu"), who serves in the employee relations department.  Counsel for Walgreens, Greg Grisham, questioned Plaintiff about her conversations with Mr. Ghogomu in great detail.  Plaintiff's relevant deposition testimony was as follows:

Q. when did you first speak with Mr.Ghogomu?
A. The night I was asked to leave the store.

{01554979.DOC}

Q. Was this -- we are going to get into that and talk about it in detail, but are you talking about the time you were asked to be interviewed by Mr. Walker and Ghogomu and you were talking to Mr. Walker?

A. Exactly.

Q. Tell me about that, how did you get Mr. Ghogomu -- come about speaking with him?

A. How did I get his name.

. . .

Q. Okay. Tell me about the conversation you had with Mr. Ghogomu?

A. I told him about the incident. I told him about the nature of the events and I think our call was interrupted. I think he had already spoken or maybe the call was interrupted so he could speak with Jake Tibbe and Mr. Walker perhaps, so he had been given some information within a few hours of our first conversation.

Q. You say you were speaking to him about it. You said you were speaking to him about the incident and the nature of the events and the call was interrupted?

A. I think. I don't recall exactly, but there was a break in our conversations. We talked several times, I think, two or three times that night.

Q. All right. So you spoke with him. How long did you speak with him the first time?

A. 45 minutes to an hour.

Q. Okay, and so you told me -- are you talking about the incident or tell me what you mean by the incident?

A. The incident where I was asked to leave because I did not wish to speak with Steve Walker. I was asked to turn in my keys and suspended with pay until the investigation was resolved or completed. The incident with Renfroe, where he stole my phone from the pharmacy counter, and I don't remember if we talked about the comment that Tracy made. I'm not sure if we talked about that the first time.

Q. Okay. When you spoke with him that first time, you say you spoke with him again that night?

A. Yes.

Q. Tell me about that time. Tell me about the second conversation?

A. Again, by this time he had been given some information by Mr. Walker and/or Mr.Tibbe, and I think to summarize his comments the comments that I made or my actions warranted me being suspended with pay or investigation ensuing in summary.

Q. Okay. Do you recall anything else that Mr. Ghogomu said during the conversation?

A. He just repeated some things that he had been told by Mr. Walker or whoever he had spoken with.

Q. With respect to that, to the best of your knowledge, it's been awhile since that happened, but if you would tell me what you remember in terms of what he said, whether he's repeating or. . .

A. I remember him saying if you said you were going to slap the piss (sic) out of someone, that is a violation of the work place violence policy, and I remember asking him where he heard that from, and he said he was not at liberty to discuss that with me.

Q. All right. Okay. Anything else that you recall Mr. Ghogomu said during that second conversation?

A. No.

Q. Do you recall anything that you said to him during that second conversation?

A. No.

Q. Okay. So we have the first call and the second call. Let's back up for a second. I just want to make sure I understand in the first call that we've exhausted your memory about it and you told me everything. I asked you what was said and you said the nature of the events and I asked about that, but can you think of anything else that you didn't tell me awhile ago about what happened?

. . .

Q. All right. Anything else that you recall telling Mr. Ghogomu the first call?

A. Not at this time.

Q. Anything else that you recall Mr. Ghogomu saying during the first call?

A. Not at this time.

Q. We just got through talking about the second call, right? Can you think of anything else he said or you said during the second call?

A. He said he was going to attempt to find someone else for me to talk to.

Q. Okay. Anything else he said?

A. No.

Q. That you can recall?

A. No.

Q. You don't recall anything else that you said during the call?

A. Not at this time.

Q. Now, was there a third call that day?

A. Yes.

Q. What time did that occur?

A. Within hours, I would say maybe the span of all of our conversations was maybe three or four hours. So, I don't remember the specific times.

Q. Do you recall if it was the same day?

A. Yes.

Q. Tell me about the third call?

A. I presumed he had spoken with someone. He had been speaking with someone at the district level, and I was told that it would be in my best interest to speak with Steve Walker that there would be no one available for me to talk with other than Steve Walker.

Q. Okay. Did you call him or did he call you the third time?

A. I don't recall. I would like to say he called me, but I don't recall.

Q. He told you that you should speak with Steve Walker?

A. Yes.

Q. Anything else that you recall Mr.Ghogomu saying during that conversation

A. No.

Q. What did you tell him during that third conversation?

A. I don't recall. I don't remember. I remember it being pretty brief.

Q. Okay. So, you had the third conversation. Did you have any other conversations with Mr. Ghogomu?

A. I don't recall having another conversation with him, I mean other than the mediation.

Q. I guess correct me if I'm wrong, I want to make sure I have a clear understanding, you believe you spoke to Mr. Ghogomu three times?

A. Yes.

. . .

Q. And you don't remember speaking with him after that time

A. I don't remember. We may have, but I don't remember.

. . .

Q. So, other than -- Mr. Ghogomu, when you were speaking with him, did you understand he was an attorney for Walgreens?

Q. Okay.

A. I was told by a supposedly unbiased party, Mr. Ghogomu and his office that basically there was no reason, I walked into this myself. I set myself up.

Q. You set yourself up. How did you set yourself up?

A. These were his words. He got information from apparently Mr. Tibbe and Mr. Walker, and that was used against me. It wasn't unbiased anymore.

Q. What was used against you? I don't really understand what you're saying?

A. Well, I never got my job back.

{01554979.DOC}

Q. Well, I guess looking at the situation did he -- did you feel, I guess, telling Mr. Renfroe that you were going to slap the piss out of him, did you think that was appropriate?

MR. PITTMAN: Objection, vague.

THE WITNESS: I'm not sure.

BY MR. GRISHAM:
Q. Did you say by taking my car keys, I would put you in the ground, do you think that was appropriate?

MR. PITTMAN: Objection, mischaracterizes testimony.

THE WITNESS: What did you ask me?

BY MR. GRISHAM:
Q. I guess it was reported that you told Mr. Renfroe that if he had taken your car keys, you would have put him in the ground?

A. It was reported.

MR. PITTMAN: Objection, mischaracterizes testimony.

BY MR. GRISHAM:
Q. The witness has provided statements during the investigation that you said that; do you feel that was appropriate?
A. I can't believe I said that.

Q. Did you say something similar to that?

A. I don't know. It may have been similar. I would have to look back at my statement.

Q. You said you contacted employee relations and you were told by an unbiased party, Mr. Ghogomu, that you set yourself up; when did that conversation occur?

A. The first or second conversation that we had that evening.

Q. Okay. All right, well, earlier in the deposition we talked about your conversation with Mr. Ghogomu. This is, quite frankly, different than what you said before, and I want to follow up and make sure I fully understand this?

MR. PITTMAN: Objection, mischaracterizes her testimony.

THE WITNESS: How is it different?

BY MR. GRISHAM:
Q. We can go back and have the court reporter look at it. I don't want to argue with you about it. I want to find out exactly what Mr. Ghogomu said during this conversation. You said that you were told by Mr. Ghogomu that you set yourself up; what else did he tell you?

A. That may not have been verbatim, but in so many words he tried to convince me that I did this to myself.

Q. Okay. And what else did he say during that conversation?

A. After I challenged his argument, I asked to speak with another loss prevention officer.

Q. Yeah?

A. And he said he would do that and get back to me.

Q. Okay. Did he get back with you?

A. He did, and by that time he had changed his mind.

Q. What did he tell you?

A. That it was in my best interest to talk to Steve Walker who I had had a previous negative experience with.

Q. Okay. Anything else Mr. Ghogomu told you during that conversation?

A. Basically he just repeated facts that were told to him. He was not unbiased. He had definitely not taken my side and had already made up his mind which direction he was going to move in.

Q. Okay. Well, tell me specifically what he said; who did he talk to?

A. I don't know, but he had gotten his information from someone other than me.

. . .

Q. Okay. All right. And you indicated that here just a second ago, you said he repeated the facts told to him and you said he was not unbiased in what direction he was going to move in. Tell me how you know that?

A. I was under the impression that employee relations benefits the employee and that's why I thought I was given his phone number or his office's phone number.

Q. Okay. I think I asked this, but you understood that Mr. Ghogomu was an attorney for Walgreens?

A. Yes, an attorney in employee relations.

Q. Okay. All right. What else did specifically Mr. Ghogomu say to you during that conversation?

A. I'm not recalling any specifics right now.

(Pl. Depo. 21:20-30:6; 31:10-13; 190:21-196:3); (See Pl. Depo., 27:5-23; 27:24-29:5; 195:23-196:3).

    Despite the fact that Walgreens repeatedly questioned Plaintiff during her deposition about all specific statements that Mr. Ghogomu made during their conversations, Plaintiff did not allege that Mr. Ghogomu told her what to write in her statement until Walgreens filed for summary judgment, relying in part on Plaintiff's written statement.  Because Walgreens thoroughly questioned Plaintiff about any statements made by Mr. Ghogomu, the new allegation that Mr. Ghogomu told her what to write should be stricken according to the law.  The Magistrate Judge correctly noted that Plaintiff never testified one way or another about whether Mr. Ghogomu told her what to include in her written statement, but the magistrate used this fact

to incorrectly conclude that Plaintiff's affidavit could therefore not be contradictory. This conclusion is inconsistent with the case law.

In *Tiller v. 84 Lumber Co.*, the plaintiff testified that he did not remember the specifics of the conversations that took place at two meetings. 886 F.2d 1316 at *3-4 (6th Cir. Oct. 10, 1989). When faced with a motion for summary judgment, plaintiff offered an affidavit that set forth specific oral promises allegedly made by management that he did not identify when he was questioned about the statements during his deposition. The Sixth Circuit noted

> there is no claim that [plaintiff] was confused at his deposition, nor is there any allegation of newly discovered evidence. [Plaintiff] offers no explanation of why he was suddenly capable, under the pressure of a motion for summary judgment, of recalling specific oral promises that would be necessary to prove his claim. Thus, [Plaintiff]'s affidavit presents this Court with the type of affidavit rejected in *Reid*—an affidavit, filed after a motion for summary judgment has been made, which without explanation, is inconsistent with prior deposition testimony.

*Id.* at *4. In *Tiller*, the plaintiff had not offered any specific testimony other than claiming he could not recall the specifics of the conversations at issue; nonetheless, the court found that his affidavit was inconsistent with his prior testimony because plaintiff offered no explanation for why he was suddenly able to recall details in light of the motion for summary judgment that he could not provide during his deposition. The court in *Tiller* explained that to allow a party to present such an affidavit without explanation would permit a party to "sandbag opposing parties in depositions, then "spring" and alleged factual basis for a claim [or defense] in an affidavit after discovery has closed. *Id.* The Sixth Circuit explained, "[c]learly, this cannot be tolerated." *Id.*

The legal standard that the Magistrate Judge applied in denying Walgreens' motion to strike was overly narrow. The law does not permit a party to allege new statements by affidavit that they were required to provide at their deposition unless they provide an explanation. If this

{01554979.DOC}

practice were permitted without requiring any explanation, it would undermine the utility of summary judgment as a procedure for screening out sham issues of fact and limit the value of taking a thorough deposition.

As in *Tiller,* Plaintiff offered sworn deposition testimony about the statements made by Mr. Ghogomu, but when confronted with a motion for summary judgment she presented her affidavits to claim that Mr. Ghogomu told her what to include in her written statement. In *Tiller*, the plaintiff offered no explanation for why he did not provide the information contained in the affidavit at the time of his deposition, and the Plaintiff in the case at bar has also offered no explanation for her new memories. As the above testimony demonstrates, Plaintiff was repeatedly asked to offer testimony about all things Mr. Ghogomu said to her. Plaintiff confirmed that she had offered complete testimony to the fullest extent of her memory. Hence, the information that Plaintiff presented in her affidavits does contradict her prior testimony, and this Court should apply *Tiller* to strike the allegation that Mr. Ghogomu told Plaintiff what to write in her statement. Case law in other jurisdictions also supports the proposition that a court is "entitled to disregard any completely new incident . . . described for the first time in [the nonmovant's post summary judgment] affidavit, assuming that prior questions had clearly asked for such information." *Hernandez-Loring v. Universidad Metropolitana*, 233 F.3d 49, 54 (citing *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 5 (1st Cir. 1994)).

Walgreens furthermore argues that these new allegations would qualify as a sham issue of fact. Despite being asked to provide testimony about all of Mr. Ghogomu's statements, Plaintiff did not indicate that Mr. Ghogomu told her what to write in her statement until she was facing summary judgment. This factor and others support a finding that the assertion is merely an effort to create a sham issue of fact.

{01554979.DOC}

This Court should note that Plaintiff has affirmed under oath that the information she provided in her written statement is true and accurate "to the best of her recollection." (Pls' Dep. 101:1-11). Nonetheless, now that Walgreens has relied on Plaintiff's written statement to support its motion for summary judgment, Plaintiff claims that Mr. Ghogomu told her what to write in the written statement. This indirect contradiction provides further support for the argument that, though not material for summary judgment purposes, it is a sham issue of fact that this Court should strike.

### B. In Plaintiff's Affidavits, She Makes Allegations Regarding Promises And Contracts Which Contradict Her Deposition Testimony, And This Court Should Strike These Contradictory Statements.

In her affidavits, Plaintiff alleged that she moved to Memphis for a number of reasons that she did not state during her deposition. This Court should strike each of these contradictory statements from Plaintiff's affidavit and from the memoranda filed by Plaintiff. In her affidavits, Plaintiff stated as follows:

> I was recruited to come and work in Memphis by Walgreens representative Eugene Hoover who made promises to me to convince me to leave North Carolina and come to Memphis. (Pl's Aff., Doc. #46-1, ¶3).

> Mr. Hoover discussed the sign-on bonus and relocation with me and never informed me of any obligation to repay the bonuses if Walgreens terminated me. Hoover also informed me that Walgreens would employ me as a pharmacist for at least three years since it was providing me with the sign-on bonuses. (Pl's Aff. Doc. #46-1, ¶4)

> In reliance on Walgreens representation, I moved from North Carolina to Memphis in or about August of 2006. I graduated from pharmacy school in December of 2006 and became a licensed pharmacist in January of 2007. (Doc. #46-1 ¶5; Doc.#62-1, ¶6; Doc. #63-1, ¶6).

> In or about 2006, . . . I had a lengthy conversation with Eugene Hoover wherein after he discussed with me the bonus and other benefits, he told me I would work in the East district of Memphis for three (3) years once I arrived in Memphis. Hoover never told me that there was any expectation that any compensation to her [sic] would ever have to be repaid. (Pl's Aff., Doc. #62-1, ¶3; Doc. #63-1, ¶3).

>Based on Mr. Hoover's contractual promises, I chose to uproot my family and move to Memphis to work with Walgreens. (Doc. #62-1, ¶ 5, Doc. #63-1, ¶5).

The above statements quoted from Plaintiff's affidavits contradict the testimony she offered in her deposition regarding conversations with Mr. Hoover and the reasons she moved to Memphis. As in *Tiller*, Plaintiff claimed she could not recall specifics about her conversations with Mr. Hoover during her deposition, but she offered specifics when she was forced to respond to summary judgment. Plaintiff claims in her affidavit that she was recruited and moved to Memphis because of promises made by Walgreens. (Pl's Aff., Doc. #46-1, ¶3); (Doc. #62-1, ¶ 5, Doc. #63-1, ¶5). By contrast, in her deposition, Plaintiff stated **"there was no particular reason"** she decided to come to Memphis as opposed to continuing to work for Walgreens in North Carolina. (Pl. Depo., 147:3 – 148:11 *emphasis added*). When asked if anyone at Walgreens made her any offers to induce her to come to Memphis to work, Ms. Evans testified **"I don't recall."** (Pl. Depo., 148:16 – 150:21). Plaintiff also denied that there were any advantages associated with moving to Memphis versus staying in North Carolina. (Pl. Depo., 149:8-14).

In her affidavits, Plaintiff states that Mr. Hoover promised her that she would work in the East Memphis District for three years upon arriving in Memphis. (Pl's Aff. Doc. #46-1, ¶4); (Pl's Aff., Doc. #62-1, ¶3; Doc. #63-1, ¶3); (Doc. #62-1, ¶ 5, Doc. #63-1, ¶5). However, in her earlier deposition, Plaintiff specifically denied that Mr. Hoover had made any such promises. (Pl's Depo., 148:5-11).

>Q: . . . I guess Mr. Hoover, I guess did he make any promises to you about you working at this particular store or this district?[2]
>
>A: He didn't make any promises.

---

[2] Plaintiff's Counsel objected on the basis that the question was vague.

{01554979.DOC}

(Pl's Depo., 148:5-11). Plaintiff offered this testimony while testifying about the reasons she moved from North Carolina to work in the East Memphis District. (Pl's Depo. 146:20-150:21). When asked if anyone at Walgreens made her any offers to induce her to come to Memphis to work, Plaintiff testified **"I don't recall."** (Pl. Depo. at 148:16 – 150:21).

Plaintiff also denied remembering the specifics of her conversation with Mr. Hoover regarding the benefits Walgreens would provide if she came to Memphis. (Pl. Depo., 148:16 – 149:7). Plaintiff's affidavits, however, definitively state that Mr. Hoover told her she would be working for the company for three years, but her affidavit provides no context for this alleged statement.

The Pharmacy Incentive Program bonus agreement specifically states,

2. If Pharmacist does not remain so employed by WALGREENS full-time in the capacity of a registered pharmacist in the designated area for 3 full year(s) of continuous service, the entire amount of the incentive payment, . . . , shall become immediately due and payable upon Pharmacist's ceasing to serve as a full-time registered pharmacist in the designated area (for any reason).

(Pharmacy Sign on Bonus Agreement). This document is relevant to this motion because Plaintiff was specifically asked if Mr. Hoover's statements about "the three years was . . . in relation to the bonus that you would receive?" (Pl's Depo., 154:19-21). Plaintiff responded to this question by specifically stating, **"I don't recall the specifics of the correlation."** (Pl's Depo., 154:22:23). Plaintiff denied remembering whether any statements made by Mr. Hoover regarding the "three years" related to the terms of the above agreement, and she also testified that she did not remember any other specifics about anything that Mr. Hoover said in relation to her three years of employment. (Pl's Depo. 154:19:155:4).[3]

---

[3] Additional testimony of Plaintiff that is relevant to this is as follows: Plaintiff denied remembering anything that she might have said to Mr. Hoover about his statement regarding the three years of employment, and she denied having discussions with any other person at Walgreens regarding her expectations that she would work for Walgreens for three years. (Pl's Dep., 155:5-16). Plaintiff also testified that she never had any conversations with

{01554979.DOC}

Plaintiff, however, contradicted her deposition testimony by definitively stating in multiple affidavits that Mr. Hoover told her Walgreens would employ her for at least three years, which contradicts Plaintiff's testimony that she did not recall the context in which the statements at issue were allegedly made. This Court should again rely on *Tiller* to strike the above statements from Plaintiff's affidavit.

The Sixth Circuit's opinion in *Tiller* is in fact directly on point. In *Tiller*, the plaintiff denied remembering what was discussed at the meetings that predated his employment with the defendant. *Tiller*, at *3-4. He could not provide any specifics at the time of his deposition, but without explanation the plaintiff in *Tiller* "was suddenly capable, under the pressure of a motion for summary judgment, of recalling specific oral promises that would be necessary to prove the claim." *Id.* at 4. During her deposition testimony, Plaintiff offered no more specific information than the plaintiff had in *Tiller*, and she also subsequently presented the definitive statements that she felt she needed just as did the plaintiff in *Tiller*. Accordingly, Walgreens respectfully argues that this Court should find that the Magistrate Judge's decision was inconsistent with the law.

**C. Despite Testifying to the Contrary, Affidavits Submitted by Plaintiff Definitively Deny She Signed or Acknowledged Any Agreements With Walgreens.**

In her affidavits, Plaintiff denies signing the Pharmacist Incentive bonus agreements, which is contrary to her sworn testimony. With respect to this issue, Plaintiff's affidavits state as follows:

> The first time I saw the alleged written bonus document was during the course of this litigation. I did not sign or acknowledge this agreement. (Pl's Aff., Doc. #62-1, ¶4; Doc. #63-1, ¶4).

The above quoted allegation from Plaintiff's affidavits relates to the Pharmacy Incentive Bonus agreement. In her affidavits, she denies that she ever saw, signed, or acknowledged the

---

anyone else at Walgreens regarding her expected three year term once she reached Memphis. (Pl's Dep., 155:17-21).

{01554979.DOC}

agreement. **Nonetheless, she previously testified that she did not recall whether she had seen them or signed them**. (Pl's Depo. 76:4-78:7). Again, this set of circumstances is analogous to those present in *Tiller*.

During her deposition, Plaintiff was given a copy of the Pharmacist Incentive Bonus agreement to review, and she was asked, "[d]o you recall signing . . . this document?" (Pl's Depo., 76:13-19). Plaintiff testified, "no," but she clarified that she did not recall whether she did or did not sign the document. Her testimony as to this issue continued as follows:

> Q: Okay. Did you receive a copy of this document?
> A: No.
> Q: Do you know that you didn't or you don't remember?
> A: **I don't remember**.
> Q: In it, it says that there is an incentive payment in the amount of $20,000; did you receive $20,000 from Walgreens?
> A: Yes.
> Q: And down at the very bottom above your name it says 4-27-06; do you recall whether you received the $20,000 - -
> A: (Interposing) Do I recall when?
> Q: Yes, Ma'am.
> A: No.
> Q: Do you recall if it was prior to you graduating or after you graduated?
> A: Before.
> Q: Okay. All right. Do you recall ever signing any agreements with Walgreens?
> A: **No.**
> Q: You don't recall signing any agreements for contracts at all with Walgreens?
> A: **I don't recall**.
> Q: When you say you don't recall, does that mean you don't remember?
> A: **I don't recall**.
> Q: Well, I guess what I'm saying, does I don't recall mean that you didn't or that you don't remember?
> A: **I don't remember.**

(Pl's Depo. 76:18-77:2 *emphasis added*)

As above noted, Plaintiff denied remembering whether or not she signed any agreements with Walgreens, but in her affidavit she definitively states "I did not sign the documents that are attached to Defendant's Counterclaim". (Pl's Aff. Doc. #46-1, ¶ 8). The new statements that

{01554979.DOC}

Plaintiff has now asserted to respond to Defendant's motions for summary judgment should be stricken because they contradict Plaintiff's deposition testimony.  This Court should find Plaintiff's new definitive statements to be a direct contradiction to her prior claims that she did not recall.  To allow a plaintiff to present a definitive statement about an event that they repeatedly denied remembering during their deposition would undermine the effectiveness of the discovery process and make summary judgment an ineffective tool.

In the case at bar, Walgreens questioned Plaintiff as thoroughly as possible about the agreements, and she repeatedly denied being able to recall.  This Court should rely on *Tiller* and hold that a Plaintiff cannot without explanation offer definitive statements that she was not able to recall at the time of her deposition because any such statement would be a contradiction of her prior claim that she did not recall.  *Tiller*, at *3-4; *Patterson v. Chicago Assoc. For Retarded Citizens*, 150 F.3d 719, 723-24 (7th Cir. 1998)(holding it was appropriate to strike allegations in affidavit when plaintiff repeatedly responded to deposition questions by stating "I don't know" and then later submitted an affidavit that was clear, detailed, and responded to the allegations presented in the defendant's motion for summary judgment)..  This Court should not allow a party to state that he or she does not remember at the time of his or her deposition and then allow that same party to subsequently present an affidavit to set forth specific statements that responds to allegations raised by the opposing party's motion for summary judgment.  The interpretation of the law applied by the Magistrate Judge was too narrow, and this Court should strike each of the above allegations as contradictory or as sham issues of fact.

## **CONCLUSION**

This appeal urges this Court to strike certain statements that Plaintiff presented by affidavit only after she reviewed Walgreens' motion for summary judgment. Plaintiff was unable to recall the statements she set forth in her affidavits at the time of her deposition testimony, but she was able to recall specific statements that were made by members of Walgreens' management when she was confronted with two motions for summary judgment. During her deposition, Plaintiff was thoroughly questioned, and she denied being able to remember any statements beyond those that were the subject of her testimony. Accordingly, Walgreens urges this Court to apply the case law cited in this memorandum to strike the allegations Plaintiff made for the first time in her affidavits on the grounds that it contradicts her sworn deposition testimony. In the alternative, this Court should strike these allegations as sham issues. The conversations that Plaintiff now remembers with specificity all took place prior to her deposition testimony, would not fall within the category of new evidence, and is not merely an effort to resolve confusion that existed at the time of her deposition. Instead, Plaintiff only recalled the statements at issue in the face of two motions for summary judgment. Accordingly, the allegations here at issue should also be disregarded as sham issues.

{01554979.DOC}

            Respectfully submitted,

            LEITNER, WILLIAMS, DOOLEY
            & NAPOLITAN, PLLC

            By:/s/ J. Gregory Grisham
             J. Gregory Grisham (#13810)
             Frank L. Day (#25345)
             Attorneys for Defendant
             Brinkley Plaza
             80 Monroe Avenue, Suite 800
             Memphis, Tennessee 38103
             (901) 527-0214
             greg.grisham@leitnerfirm.com
             frank.day@leitnerfirm.com

## CERTIFICATE OF SERVICE

  I hereby certify that on the 25th day of May 2011, a copy of the foregoing electronically filed instrument was served on the parties listed below by first-class mail, postage prepaid, unless said party is a registered CM/ECF participant who has consented to electronic notice and the Notice of Electronic Filing indicates that Notice was electronically mailed to said party:

Darryl J. O'Neal
Attorney for Plaintiff
2129 Winchester Road
Memphis, Tennessee 38116

Aubrey "Nick" Pittman
Pittman Law Firm, P.C.
Attorney for Plaintiff
100 Crescent Courts
Suite 700
Dallas, TX 75201

            s/ J. Gregory Grisham
             J. Gregory Grisham